# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TSAMOTA CERTIFICATION
LIMITED,

                    Plaintiff,

v.

ANSI ASQ NATIONAL
ACCREDITATION BOARD LLC,

                    Defendant.

Case No. 17-CV-839-JPS

**ORDER**

## 1.     INTRODUCTION

This is an action for breach of contract and unjust enrichment. Plaintiff provides auditing and certification services to private security companies. Defendant accredits companies like Plaintiff. Plaintiff sought accreditation from Defendant but did not obtain it. Plaintiff believes that Defendant wrongfully terminated it from the accreditation program. Defendant, of course, disagrees. Defendant filed a motion for summary judgment on March 1, 2018, seeking dismissal of both claims. (Docket #16). The motion is now fully briefed. (Response, Docket #24; Reply, Docket #27). For the reasons explained below, the motion must be granted.

## 2.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

## 3.     RELEVANT FACTS

The disposition of Defendant's motion turns on only a few key facts. However, the subject matter of this action is somewhat intricate. For clarity's sake, the Court will provide an expanded recitation of the facts than is strictly necessary to its decision.[1] Plaintiff is in the business of providing auditing and certification services to private security companies ("PSCs"). This service, known as Private Security Company Management Services ("PSCMS"), has grown over the past fifteen years with the increased use of PSCs by governments and because of various well-publicized incidents of human rights abuses perpetrated by PSC personnel.

PSCMS certification is valuable to PCSs because it gives governments some assurance that they are ethical and rule-complaint. PSCMS companies like Plaintiff can in turn seek accreditation to help market their services. There are two bodies which provide PSCMS accreditation: Defendant and the United Kingdom Accreditation Service ("UKAS").[2] Both are private, non-governmental entities. Plaintiff sought to enter the PSCMS market in 2012. Though Plaintiff is based in Europe, it

---

[1]The facts are drawn from the parties' factual briefing unless otherwise noted. *See* (Docket #25 and #28).

[2]Defendant offers many other accreditation programs beyond PSCMS. *See* (Docket #25 ¶¶ 7-13).

decided to pursue accreditation through Defendant because Defendant is an American company, and Plaintiff wanted to target American PSCs.

Defendant's Management Systems Accreditation Manual (the "Manual") describes its accreditation process. Those seeking accreditation (like Plaintiff) are called certification bodies ("CB"). There are seven steps in the accreditation process:

1. The CB submits a fee and files an initial accreditation application together with documentation demonstrating that it conforms to certain baseline requirements. Defendant notifies the CB whether or not its initial application is complete and acceptable.

2. Once its initial application is accepted, the CB purchases and downloads another application related to the specific standard for which accreditation is sought. The CB then uploads the completed application with the supporting documentation. Defendant reviews the documentation to determine whether the specific application is complete and acceptable.

3. Following the acceptance of its specific application and prior to conducting an Initial Office Assessment ("IOA"), the CB performs a complete internal audit and at least one complete management review that includes review of the results of the complete internal audit.

4. Defendant then performs an IOA and prepares a report itemizing any nonconformities with applicable rules and professional standards. The CB must address each nonconformity by taking corrective action, in accordance with the process and deadline set out in the Manual.

5. Next, Defendant performs the first of two Witnessed Audit Assessments ("Stage 1 Witnessed Audit") of the CB's actual clients. Defendant then issues a report

which outlines nonconformities which the CB must remedy before moving forward in the accreditation process.

6. Once those nonconformities are addressed, Defendant performs the second Witnessed Audit Assessments ("Stage 2 Witnessed Audit"). Any identified nonconformities must once again be corrected by the CB, in accordance with the process set out in the Manual, before proceeding.

7. Finally, if the CB meets all of the foregoing requirements, Defendant formulates an accreditation package and recommendation on accreditation which it presents to its Management Systems Accreditation Council (the "Council"). The Council then votes on whether to accredit the prospective CB. If the vote is favorable, then the Defendant issues the CB a certificate of accreditation.

*See* (Docket #19-2 and #19-3). The Manual also provides a one-year time frame for completion of the accreditation process. (Docket #19-3 at 7). The Manual gives Defendant discretion in enforcing that time limit, though the parties dispute the extent of the latitude provided.

Accreditation is not awarded based simply on Defendant's opinion of the CB. Rather, Defendant applies national and international standards to evaluate whether accreditation is appropriate. These standards are developed in cooperation with a number of international accreditation associations, of which Defendant is a member. When Plaintiff began the accreditation process, the standard for PSCMS accreditation was known as ISO/IEC 17021:2011 ("17021"). A new standard, ISO/IEC 17021-1:2015 ("17021-1"), was later published and set to take effect on June 15, 2017, though Defendant planned to transition its program to the new standard long before then. (Docket #21-6 at 2). According to Accreditation Rule 50

("AR 50") promulgated by Defendant, CBs were required to transition their application to the new standard over the course of 2016. *Id.* at 2-4.

17021 and 17021-1 are, in turn, based on even higher standards. The first is "Management System for Quality of Private Security Company Operations--Requirements with Guidance," American National Standard, ANSI/ASIS PSC.1:2012 ("PSC.1"). The second is "Conformity Assessment and Auditing Management Systems for Quality of Private Security Company Operations," American National Standard, ANSI/ASIS PSC.2 ("PSC.2"). Both standards are issued by the American National Standards Institute and are based on various international documents and agreements. PSC.1 provides "requirements and guidance for a management system with auditable criteria[,] . . . consistent with respect for human rights, legal obligations and good practices[.]" (Docket #21-7 at 3, 17-22). PSC.2 offers "requirements and guidance for conducting conformity assessment of the [PSC.1] Standard." (Docket #21-8 at 3, 11). PSC.1 governs PSC conduct, while PSC.2 is aimed at PSCMS companies. Of course, Plaintiff needed to be intimately familiar with both of these standards. Compliance with PSC.1 and PSC.2 was the end goal of the PSCMS accreditation process.

Defendant itself is also subject to standards for processing accreditation requests. ISO/IEC 17011 ("17011") is the standard relevant to Plaintiff's desired form of accreditation. 17011 mandates that Defendant require a commitment from its CBs to fulfill the requirements for accreditation, including when those requirements change over time. It also requires that CBs cooperate with Defendant in the accreditation process. Plaintiff notes that 17011 further obliges Defendant to "give due notice of any changes to its requirements for accreditation," including a decision on

the time for implementing such changes. (Docket #19-1 at 25). The Manual memorializes these and other requirements for accreditation.

Generally, Defendant requires an accreditation-seeking PSCMS company to execute a Certification Applicant Agreement ("CAA") at the outset of the application process. Defendant's form CAA provides that it remains in effect until the CB and Defendant execute an accreditation agreement. CBs are required by Defendant to sign an accreditation agreement upon successful completion of the accreditation program. The form CAA also includes an indemnity provision. The parties agree that, contrary to the usual procedure, Plaintiff did not sign a CAA.

Nevertheless, the parties proceeded through the accreditation process. On September 22, 2014, Plaintiff paid the initial application fee to Defendant. Plaintiff submitted a completed initial application on October 28, 2014, thereby completing step one. Six months later, Plaintiff obtained the specific application for PSCMS companies. Soon afterward, on May 1, 2015, Plaintiff submitted a completed application with supporting documentation. Eventually, after a number of resubmissions of the application, Defendant approved Plaintiff's application on August 4, 2015.

Defendant conducted the IOA on September 9 and 10, 2015. The IOA resulted in seventeen minor non-conformity reports ("NCRs"). Defendant issued a report of its IOA to Plaintiff on September 22, 2015. The Manual requires that all minor NCRs be resolved within ninety days—in this case, December 11, 2015. (Docket #19-2 at 16). The NCR resolution deadline was twice extended by Defendant, consistent with the terms of the Manual, at Plaintiff's request. Plaintiff closed sixteen of the NCRs by January 16, 2016, and the final NCR was closed on February 11, 2016. Defendant then

conducted another IOA on February 16-18, 2016. This resulted in three NCRs, all of which were closed by March 26, 2016.

While the IOA process was ongoing, the parties proceeded to the Stage 1 Witnessed Audit. After a few scheduling issues, this was completed on October 21 and 22, 2015, with Plaintiff's client Salamanca Risk Management Ltd. ("Salamanca"). The Stage 1 Witnessed Audit resulted in one minor NCR which was resolved within a month. Plaintiff and Defendant identified a number of problems in Salamanca's ability to comply with PSC standards. On January 18, 2016, Salamanca chose to withdraw from (or at least postpone) the auditing process with Plaintiff.

On November 20, 2015, Plaintiff proposed that the Stage 2 Witnessed Audit be conducted with another client, Sabre 22, in light of Salamanca's (at that time impending) withdrawal. The Manual states a preference for using the same client for both witnessed audits, though the parties dispute how forceful this preference is. Defendant says that it expressed unease about the difficulties in switching clients, while Plaintiff notes that Defendant did not mandate that Plaintiff use Salamanca again. Defendant was also concerned about whether the audit, to take place at Sabre 22's home office rather than in the field, would be a good representative client meeting. The parties had no choice but to proceed with Sabre 22, however, as it was Plaintiff's only remaining client.

Plaintiff says that Defendant failed to provide dates for this audit. Defendant counters that Plaintiff needed to resolve its outstanding NCRs from the IOA before continuing to the next step in the process, and that did not occur until March 26, 2016. Plaintiff was apparently so concerned with the delay that it filed a formal complaint with Defendant pursuant to Defendant's internal complaint procedures. In a letter dated February 22,

2016, the assigned investigator concluded that Defendant was not responsible for the delays, but they were instead occasioned by Plaintiff's large number of NCRs and by switching clients between the audits. *See* (Docket #29-1).

Plaintiff's Stage 2 Witnessed Audit was eventually scheduled for March 29 and 30, 2016. The audit was then rescheduled twice more at Plaintiff's request. Finally, the audit was successfully completed on May 11 and 12, 2016. It resulted in one minor NCR and three major NCRs. The minor NCR was quickly closed. Defendant notified Plaintiff that the major NCRs meant that the Stage 2 Witnessed Audit would need to be re-done. Despite this notice, Plaintiff nevertheless asked Defendant to make an accreditation recommendation per step seven. Defendant declined to do so before Plaintiff's successful completion of the entire accreditation process.

Just after the initial Stage 2 Witnessed Audit was completed, Defendant warned Plaintiff that it had a growing concern about the length of time that Plaintiff's application had been pending. On July 1, 2016, Defendant asked that Plaintiff keep it apprised of progress in scheduling the second Stage 2 Witnessed Audit. Defendant's representative specifically stated that "[a]s long as progress is being made [Defendant] will not enforce the 12-month rule in regard to inactivating the application. I will assume the process will continue to progress as it has the past few months." (Docket #19-19 at 1). Plaintiff assured Defendant that it aimed to achieve accreditation by the end of 2016. Defendant again checked on Plaintiff's availability for the second Stage 2 Witnessed Audit in September 2016. In October 2016, Plaintiff informed Defendant that Sabre 22 was having difficulty correcting the NCRs. Plaintiff therefore proposed that a different

client be used for the next audit. That client's operations were located in Niger.

Defendant did not directly respond to that proposal. Instead, on October 10, 2016, it sent Plaintiff a letter stating that Plaintiff's application would be unilaterally withdrawn. (Docket #19-13). The letter states, in pertinent part:

> [Plaintiff] applied for ANSI/ASIS PSC.1 accreditation on 28 April 2015 and the application remains open today. As [Defendant] has communicated previously with [Plaintiff], we have a 12-month timeframe for an applicant to gain accreditation; obviously [Plaintiff] is significantly beyond this timeframe and with the most recent proposed witnessed audit schedule, the application could continue to remain open 2 years after application; which is not acceptable, especially in light of the ISO/IEC 17021-1 transition upon [Plaintiff] now.
>
> [Defendant] recognizes there have been various factors affecting this application process, as follows;
>
> The initial office assessment required a follow-up assessment. The Stage 2 witnessed audit requires a re-audit and now [Plaintiff] is proposing the third client change, which I understand is due to the clients; however, we would have to witness another stage 1 and stage 2 witnessed audit in order to maintain an acceptable level of continuity within the initial certification process.
>
> Then, as identified above, we are in transition for ISO/IEC 17021-1 with [Defendant's] applicant['s] and accredited CBs. All CBs are required to have an application, document review, and office assessment to ISO/IEC 17021-1 in the calendar year 2016. I was hoping [Plaintiff] would be through the initial accreditation process by now and we could schedule a transition office assessment with your first 6-month office assessment; however, that is not the case. [Defendant] would not be able to recommend

accreditation for a CB in 2017 to the older ISO/IEC 17021 standard.

Based on [Defendant]'s Accreditation Manual's requirement to gain accreditation within 12 months of applying, and in light of the items identified above, which will continue to delay the process, [Defendant] will be withdrawing [Plaintiff]'s ANSI/ASIS PSC.1 application tomorrow, 11 October 2016, per [Defendant]'s Accreditation Manual.

*Id.* Plaintiff asserts that the real reason its application was withdrawn was not a concern for delays or standards, but rather that Defendant did not want to deploy personnel to Niger due to the perceived danger there. Plaintiff's only evidence on this point, however, is the timing of the letter. It has no direct evidence of Defendant's decision-making process beyond the letter itself. Defendant denies that it was unwilling or unable to work in Niger.

Plaintiff appealed the withdrawal decision in accordance with Manual procedures. The primary bases for the appeal were Defendant's implicit extensions and/or waiver of the time limit and AR 50 transition requirements. Plaintiff further asserted that Defendant improperly applied those rules. Plaintiff's appeal was granted in part. Its application was reinstated, but various additional requirements were imposed by the appeal panel. These included submitting a 17021-1 application, completing another office assessment, clarifying where Plaintiff would operate its business from to ensure that applicable European regulations were met, and performing new Stage 1 and 2 Witnessed Audits with the same client. All of these tasks were to be completed by June 30, 2017.

Plaintiff objected to the panel's decision, claiming that the decision was imprecise and the requirements it imposed were excessive. Plaintiff felt

that the final Stage 2 Witnessed Audit was all that remained between it and accreditation, and the panel's decision unreasonably mandated that Plaintiff start the accreditation process all over again. Plaintiff also complained that, due to Defendant changing its appeal procedures, there appeared to be no further right of review. Plaintiff further stated that it believed it had a contract with Defendant which Defendant had breached. Plaintiff threatened a lawsuit.

Plaintiff admits that it did not continue with the accreditation process after this point. Plaintiff excuses this inactivity for the reasons noted above, though principally because it was not feasible to complete the new requirements in the time allotted. On June 16, 2017, with no activity from Plaintiff, Defendant again withdrew Plaintiff's application, effective July 1, 2017. This was unsurprising, given that this lawsuit had already been filed on June 15, 2017. Plaintiff's lawsuit seeks to recover the $38,659.30 it paid to Defendant as fee for Defendant's accreditation services, as well as lost profits and the expenses it incurred during the accreditation process. (Docket #1 at 8).

4.      **ANALYSIS**

As noted above, Plaintiff brings two claims in this action, one for breach of contract, and the other for unjust enrichment. Defendant seeks summary judgment on both claims. The Court will address each in turn.

4.1      **Breach of Contract**

As stated in the Complaint, Plaintiff's breach of contract claim is rather vague. Plaintiff alleges that Defendant held itself out as offering PSCMS accreditation services. *Id.* at 6. Plaintiff then "engaged" Defendant's services and paid for them. *Id.* at 6–7. Defendant allegedly "failed to perform the accreditation services which it was contracted to perform." *Id.*

at 7. Plaintiff specifically states that Defendant refused to provide accreditation services "by unilaterally terminating [Plaintiff's] application." *Id.* No written contract is attached to the Complaint, and the terms of the parties' purported agreement are not described in any detail.

In the absence of a CAA signed by Plaintiff, Defendant maintains that the parties' alleged contract could only have been oral. It appears that Plaintiff rests the purported contract in both the oral and written communications between the parties prior to the submission of Plaintiff's first application. *See* (Docket #25 ¶ 97). However, Plaintiff fails to explain precisely what communications formed the contract and what the terms of the agreement were.

These failures of proof spell the demise of Plaintiff's breach of contract claim, for two reasons. First, Seventh Circuit precedent holds that contract law should not be applied to the provision of accreditation services. *Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Sch. & Coll.*, 44 F.3d 447, 449 (7th Cir. 1994). In *Chicago School*, the plaintiff school (the "School") sued the defendant accreditor (the "Alliance") for withdrawing the School's accreditation. *Id.* at 448. Without accreditation, the School's students could not secure federal student loans. *Id.* Unable to pay for the School's tuition themselves, the students left, and the school went under. *Id.*

The School's suit was for breach of contract. It argued that "[b]y applying for accreditation and sending in its fee, . . . it accepted the Alliance's offer [of contract], the terms of which were established by the Alliance's rules and bylaws." *Id.* The School maintained that the Alliance's conduct violated its own rules, thus breaching the agreement. *Id.* at 449. The Alliance, however, asserted that the case must be decided under the

deferential principles of administrative law. *Id.* If this were true, the court could only review the Alliance's accreditation decision for arbitrariness or capriciousness. *Id.*

The court agreed with the Alliance. It found that

accrediting bodies are not engaged in commercial transactions for which state-law contract principles are natural matches. The "contract" the School wants to enforce is not a bargained-for exchange but a set of rules developed by an entity with many of the attributes of an administrative agency. Accreditation groups adopt and change their rules unilaterally; by posting an application fee a trade school cannot lock in a favorable set of rules. One set of rules applies nationwide[.] . . . [The School] wanted a key that would unlock the federal Treasury. An accrediting agency is a proxy for the federal department whose spigot it opens and closes. If accreditation—which the Secretary of Education treats as a sort of license or certificate—were bestowed by the federal agency directly, no one would suppose that state [contract] law governed.

*Id.* Thus, the School's only avenue for relief was administrative law. *Id.* The court ultimately held that summary judgment was appropriate in the Alliance's favor because the School had no evidence that the Alliance's decision was arbitrary. *Id.* at 450–51.

Following similar reasoning, other courts have declined to apply contract law to accreditation disputes. *Prof'l Massage Training Ctr., Inc. v. Accreditation Alliance of Career Sch. & Coll.*, 781 F.3d 161, 181 (4th Cir. 2015) ("The Standards of Accreditation do not constitute a binding contract between the [accreditor] and the accredited educational institutions because the [accreditor] can alter the alleged 'contract' at will and, thus, is not bound by its terms."); *Found. For Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 532–33 (6th Cir. 2001) ("We

agree with the district court that these claims arise from the Foundation's decision to deny the College's accreditation application. We therefore review the Foundation's decision as an accreditation decision [under the arbitrariness standard], not as a contract, fiduciary duty, fraud or other common law claim."). Other district courts in this Circuit have also applied *Chicago School* in a manner this Court finds persuasive. *Castrillon v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 51 F. Supp. 3d 828, 842–43 (S.D. Ind. 2014) (holding, in reliance on *Chicago School*, that the plaintiff doctor was not a third-party beneficiary of an accreditation agreement between the defendant hospital and its accreditor, because the plaintiff could not identify any enforceable contract between those two entities).

This Court is bound by *Chicago School* and finds the other above-cited precedents persuasive. They instruct that courts should not countenance breach of contract claims based on an alleged violation of an accreditor's own rules and procedures. This is precisely what Plaintiff asserts here. (Docket #24 at 26) ("Here, ANAB breached its duty of good faith and fair dealing by failing to provide accreditation services in accordance with *its rules, policies, and procedures presented on its web page and in its Accreditation Manual*.") (emphasis added). Plaintiff's ultimate accreditation, as determined by Defendant through the application of its rules, was not a relationship of mutual assent to bilateral promises. Rather, Defendant alone controlled the process and could change its rules at any time without input from Plaintiff. Under *Chicago School*, Plaintiff's remedy is not in a breach of

contract action, but an action challenging any potential arbitrariness in Defendant's accreditation conduct.[3]

Plaintiff's arguments to the contrary lack merit. Plaintiff's chief contention is that it "is not complaining that it was entitled to accreditation which was withheld. Rather, . . . [Defendant] agreed to provide a process through which [Plaintiff] could seek accreditation, but then turned out to be incapable of providing such an accreditation process." (Docket #24 at 24). It is undisputed that Defendant provided some form of accreditation services to Plaintiff over a number of years. Thus, Defendant was not literally "incapable" of providing accreditation services. Rather, to be "incapable" as Plaintiff contemplates it, Defendant must have failed to abide by its own standards, which are in turn determined by overarching rules like 17011, 17021-1, PSC.1, and PSC.2.[4] In accordance with *Chicago*

---

[3]Plaintiff offers contrary authority on the *Chicago School* question, but it is inapposite. (Docket #24 at 22). Those cases deal with whether the Higher Education Act preempts contract remedies, but this Court relies only on *Chicago School*'s observations about the nature of accreditation, not any holding regarding preemption. Further, Plaintiff's cases are primarily district court decisions from outside this Circuit, and thus carry little persuasive value. The only Circuit authority, *Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222 (9th Cir. 1994), addressed whether students could sue their school's accreditor in tort for negligently accrediting the school. *Keams* did not address the availability of contract remedies between an entity seeking accreditation and an accreditor.

[4]Plaintiff's true aim, to attack Defendant's application of its own standards, is confirmed in a response to an interrogatory from Defendant. Therein, Plaintiff described which accreditation services it believed Defendant had failed to perform:

> ANAB failed to provide the requisite personnel required to conduct a Stage Two audit when reasonably requested by TCL within the accreditation time frame agreed between ANAB and TCL. ANAB applied the incorrect standard in connection with its office assessment of TCL. TCL was denied an opportunity to appeal the appeal decision. Moreover, ANAB did not provide TCL with

*School*, allegedly improper application of those rules does not give rise to a breach of contract action.[5]

Plaintiff's other counterarguments fare no better. First, it maintains that *Chicago School* and the other cited precedents are limited to higher education accreditation. While many of the cases do arise in that realm, *Chicago School* announces no such limitation on its rationale. *See Castrillon*, 51 F. Supp. 3d at 842–43 (applying *Chicago School* outside the education context). This Court is no more able to contradict the logic of binding precedent like *Chicago School* than it is empowered to ignore Seventh Circuit decisions on analogous facts. Second, Plaintiff argues (in the introduction to its brief) that Defendant waived application of *Chicago School* by failing to assert it as an affirmative defense. (Docket #24 at 2–3). Plaintiff cites no authority for this claim. The Court concludes that the matter is not in the nature of an affirmative defense, but rather a legal argument which may be

---

sufficient time to complete the accreditation process, that is, ANAB acted in non-conformity with its earlier statements, both written and oral, that TCL would require (and be afforded) two years to secure accreditation. TCL was on track to complete the accreditation process, notwithstanding substantial delays occasioned by ANAB, when ANAB abrogated the contract in October 2016.

(Docket #18-10 at 7–8). Each of these concerns relates to adherence to or deviation from a rule or procedure that forms part of the accreditation process.

[5]Plaintiff asserts that Defendant has never successfully accredited a PSCMS applicant. Defendant admits this. (Docket #28 ¶ 77). Defendant notes, however, that it has accredited numerous companies under the 17021 and 17021-1 standards for business sectors other than PSCs. *Id.* Plaintiff ties this into its "incapability" argument by stating that "[Defendant]'s undisclosed lack of experience and competence in PSCMS accreditation finally led it to pull the plug on TCL's application[.]" (Docket #24 at 25). Plaintiff does not point to any factual support for this belief. *Austin v. Walgreen Co.*, 885 F.3d 1085, 1089 (7th Cir. 2018) ("Speculation does not defeat summary judgment.").

raised at any time. In any event, Defendant has always denied that Plaintiff has failed to state a viable claim for relief. (Docket #10 at 15).

Finally, Plaintiff contends that Defendant's usual practice of obtaining a signed CAA demonstrates the contractual nature of the parties' relationship. This ignores the fact that these parties *did not* sign a CAA. Plaintiff insists that Defendant cannot "have it both ways": denying the contractual nature of the accreditation relationship while requiring applicants to sign a CAA. (Docket #24 at 24). Yet Defendant can indeed have it both ways. Plaintiff does not argue that the CAA, had it been signed, contains any provisions which Defendant would have violated in the course of the parties' dealings. Indeed, the CAA is nothing more than a contract of adhesion, imposing burdens only upon the signing CB. *See* (Docket #21-34 at 2). It does not require Defendant to do anything, even something as vague as performing "accreditation services" or providing an "accreditation process." *Id.* Plaintiff cannot credibly assert that the CAA, signed or unsigned, has any relevance to this case.

Beyond the instruction of *Chicago School*, Plaintiff's contract claim fails for another, simpler reason. Under Wisconsin law, Plaintiff bears the burden to prove the existence of a contract, including an offer, acceptance, and an exchange of consideration. *Kopp v. Sch. Dist. of Crivitz*, 905 N.W.2d 843, 2017 WL 4413020, at *5 (Wis. Ct. App. Oct. 3, 2017). Wisconsin contracts must also be "definite and certain as to [their] basic terms and requirements," which is turn determined by whether, and as to what, the parties reached a "meeting of the minds." *Herder Hallmark Consultants, Inc. v. Regnier Consulting Grp., Inc.*, 685 N.W.2d 564, 566 (Wis. Ct. App. 2004) (quotation omitted). In other words, "[v]agueness or indefiniteness as to an essential term of the agreement *prevents the creation* of an enforceable

contract, because a contract must be definite as to the parties' basic commitments and obligations." *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 75 (Wis. 1996) (emphasis in original).

Defendant accuses Plaintiff of failing to provide factual support for its allegation that an enforceable contract existed between the parties. The best Plaintiff has done to define the purported contract is to call it oral and gesture at some pre-application communications between the parties. As mentioned above, the Complaint contains only the circular allegation that Defendant breached the contract by "fail[ing] to perform the accreditation services which it was contracted to perform." (Docket #1 at 7).

A common description of summary judgment is that it is "the put up or shut up moment in a lawsuit." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted). Plaintiff, as the non-moving party bearing the burden of proof on its breach of contract claim, must "identify[] specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Id.* Plaintiff falls woefully short of accomplishing this. Plaintiff cites no evidence at all on the issue of whether a sufficiently definite contract exists. *See* (Docket #24 at 24–25). Instead, it maintains that Defendant did not provide accreditation services in an acceptable manner. Specifically, "[Defendant]'s inability to provide the accreditation process, and its improper termination of [Plaintiff's] application constitute breaches of its contractual obligations." *Id.* at 25. Plaintiff has ignored Defendant's challenge, which was to identify the facts upon which a reasonable jury could find an enforceable contract under Wisconsin law. By refusing to develop an argument to counter Defendant's assertion, Plaintiff leaves it

unrebutted. The Court must deem the matter waived. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).[6]

### 4.2    Unjust Enrichment

For its unjust enrichment claim, Plaintiff alleges that it paid Defendant on the misrepresentation that Defendant could and would provide PSCMS accreditation services. (Docket #1 at 7–8). To establish unjust enrichment, a plaintiff must prove three things: "(1) a benefit conferred on the defendant by the plaintiff; (2) appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable to do so." *Sands v. Menard*, 904 N.W.2d 789, 798 (Wis. 2017). Defendant argues that this claim fails for two reasons. First, unjust enrichment is an equitable remedy which is generally not available when the aggrieved party has a legal avenue for relief. *See First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985); *Meyer v. The Laser Vision Inst.*, 714 N.W.2d 223, 230–31 (Wis. Ct. App. 2006). Plaintiff has such an avenue—a claim based on arbitrariness as described by *Chicago School*—but has not pursued it.

---

[6]Plaintiff's refusal to address the issue of contract formation is starkly apparent in the remainder of its argument on the breach of contract claim. As discussed above, Plaintiff's first theory of breach is that Defendant failed to "perform the accreditation services" it had agreed to. Plaintiff's second theory, announced for the first time in its response brief, is that Defendant violated an implied duty of good faith and fair dealing. *M&I Marshall & Ilsley Bank v. Schlueter*, 655 N.W.2d 521, 524–25 (Wis. Ct. App. 2002) ("Wisconsin law recognizes that every contract implies good faith and fair dealing between the parties to it."). Plaintiff's resort to this implied duty so late in this action confirms that it cannot, or will not, point to any specific agreement between the parties and explain how Defendant did not carry out its part of that bargain.

Second, "[u]njust enrichment involves getting something for nothing, not providing a product for a price[.]" *Assoc. Banc-Corp v. John H. Harland Co.*, No. 06-C-1097-WCG, 2007 WL 128337, at *2 (E.D. Wis. Jan. 11, 2007) (citing *Ramsey v. Ellis*, 484 N.W.2d 331, 333 (Wis. 1992)). It is uncontested that Plaintiff paid Defendant and that Defendant did *something*, whether or not Plaintiff was fully satisfied with Defendant's service. Indeed, Defendant maintains that it provided Plaintiff with substantial services at every stage of the accreditation process, including "application support, review of and feedback on proposed systems documentation, and preparation for, performance of, and feedback on an Initial Office Assessment, a Follow-up Office Assessment, a Stage 1 Witnessed Audit Assessment, and a Stage 2 Witnessed Audit Assessment." (Docket #20 at 27). Defendant argues that Plaintiff has offered no evidence upon which a reasonable jury could conclude that the fees it paid were not directly connected to the corresponding services it received from Defendant.

Defendant's reasoning is persuasive, and as before, this is largely due to Plaintiff's refusal to argue otherwise. Plaintiff baldly states that it would be "inequitable for [Defendant] to retain [its fees] because [Defendant] failed to have necessary measures in place to appropriately evaluate [Plaintiff's] accreditation application and provide accreditation services." (Docket #24 at 29). Which measures were lacking? Which services were not provided? Plaintiff does not say. *Id.* at 29–30. Defendant's opening brief pointed to specific services it rendered, and Plaintiff makes no effort to show how the fees it paid were not merely payment for those services. The Court cannot, and will not, invent arguments on Plaintiff's behalf.

*Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1335 (7th Cir. 1995) ("The federal courts will not invent legal arguments for litigants.").

Plaintiff's only meaningful defense of its unjust enrichment claim is that the parties' "relationship was a commercial transaction governed by contract principles. Thus, unjust enrichment is the appropriate remedy if the Court determines no contract existed." (Docket #24 at 29); *Linquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 476 (7th Cir. 2009) ("In the absence of an enforceable contract, . . . a plaintiff may turn to quasi-contractual theories of relief."). Plaintiff is correct about the second proposition, but as discussed above, *Chicago School* says that it is mistaken about the first. Because the instant case sits outside contract law, Plaintiff cannot resort to a quasi-contractual claim of unjust enrichment.

**5.     CONCLUSION**

The parties' briefing demonstrated disagreement on nearly all of the minutiae of this case and represented an attempt to make mountains out of every molehill. When distilled to its core, the outcome of the instant motion, and this action generally, is quite simple. While Plaintiff might feel aggrieved by Defendant's conduct during the accreditation process, it has sought forms of relief which are unavailable on the facts of this case. Defendant's motion must, therefore, be granted, and this action dismissed with prejudice.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Docket #16) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 24th day of April, 2018.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge